HENRY WILLIAMS, ALIAS ED JONES, v. THE STATE.

No. 1416.    Decided February 7, 1912.

Rehearing denied March 6, 1912.

**1.—Murder—Evidence—Expert Testimony.**

Upon trial of murder, there was no error in permitting a physician of long standing to testify as to his opinion as to the character of instrument that was used in inflicting the wound upon deceased.

**2.—Same—Evidence—Flight.**

It is always permissible to show flight of defendant, especially, in a case depending in part on circumstantial evidence.

**3.—Same—Evidence—Confessions.**

Where, upon trial of murder, the evidence, on preliminary hearing as to whether a confession was voluntary, was prima facie admissible, there was no error.

**4.—Same—Charge of Court—Confessions.**

Where, upon trial of murder, the court's charge on confessions was sufficient in the absence of requested charges, and the motion for new trial did not point out any error therein, there was no reversible error; besides, the other evidence in the case was sufficient to support the verdict without the confession.

**5.—Same—Evidence—Immaterial Incidents.**

Evidence merely going to show that at the time deceased was killed, an account book had been lost and never recovered, would not tend to prove any material fact for the defense; it not being shown that said book had been found in possession of a person other than defendant.

**6.—Same—Evidence—Imputing Crime to Another.**

Where, upon trial of murder, defendant's witnesses were permitted to tell as to what deceased said about having trouble with others, there was no error not to permit the witness to tell what they had heard others say.

**7.—Same—Evidence—Voluntary Confession.**

Upon trial of murder, there was no error in excluding testimony as to the probable effect threatening, coaxing, and intimidation would have on a negro of the lower classes to induce him to make a confession; these are matters for the jury.

Vol. LXV Crim.—13.

**8.—Same—Evidence—Acts of Defendant—Bill of Exceptions.**

The coming and going of a defendant, and his conduct in general after the commission of an offense, was admissible in evidence; besides, the bill of exceptions was defective.

**9.—Same—Argument of Counsel—Charge of Court.**

Where the remarks of State's counsel were not such as to arouse the passions and prejudices of the jury, there was no reversible error in the absence of requested instructions to withdraw the same.

**10.—Same—Accomplice—Charge of Court.**

Where the appellant complained of the action of the court, in failing to submit his special charge on the theory that defendant could not be convicted as an accomplice under the indictment charging ·him as a principal, but the evidence or defendant's- confession did not make him an accomplice, there was no error.

**11.—Same—Affidavits—Attorney and Client.**

Affidavits taken by an attorney for the defendant and attached to the motion for new trial, can not be considered on appeal. Following Maples v. State, 60 Texas Crim. Rep., 169.

**12.—Same—Evidence—Bill of Exceptions.**

Where no bills of exception are reserved to the admission or rejection of evidence, the same can not be considered on appeal.

**13.—Same—Newly Discovered Evidence.**

The question of newly discovered evidence in the motion for new trial can not be considered, in the absence of affidavits thereto.

**14.—Same—Practice on Appeal.**

In the absence of a bill of exceptions a complaint about a juror, the reprimand of counsel, etc., can not be considered.

Appeal from the District Court. of Jefferson. Tried below before the Hon. W. H. Pope.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*T. H. Bowers* and *David E. O'Fiel,* for appellant.—On the question of expert and nonexpert opinion testimony: Steagald v. State, 24 Texas Crim. App., 207; Thompson v. State, 30 Texas Crim. App., 325; Williams v. State, 30 Texas Crim. App., 354; Lumpkin v. State, 12 Texas Crim. App., 341.

On question of defendant's escape: Draper v. State, 22 Texas, 401; Thrasher v. State, 3 Texas Crim. App., 281; Tyson v. State, 14 Texas Crim. App., 388.

On question of admitting confessions: Cain v. State, 18 Texas, 387; Walker v. State, 2 Texas Crim. App., 326; Thomas v. State, 35 Texas Crim. Rep., 178; Gallagher v. State, 50 S. W. Rep., 338; Spicer v. State, 52 Texas Crim. Rep., 177; Taylor v. State, 52 id., 190.

On question of argument of counsel: Shackelford v. State, 43 Texas, 138; Honneycutt v. State, 18 Texas Crim. App., 498; Boscow v. State, 33 Texas Crim. Rep., 390.

On question of court's charge on confession: Johnson v. State, 48 Texas Crim. Rep., 423.

On question of accomplice: Philips v. State, 26 Texas Crim. App., 228; Rix v. State, 33 Texas Crim. App., 353.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, J<small>UDGE</small>.—Appellant was indicted by the grand jury of Jefferson County, charged with murder. He was adjudged guilty of murder in the first degree and his punishment assessed at death.

The State introduced in evidence a confession alleged to have been made by defendant. It reads as follows:

"I, Eddie Jones, being in the custody of an officer, having been duly warned by Marvin Sourlock, county attorney of Jefferson County, Texas, to whom this statement is made, that I do not have to make any statement at all and that any statement made by me may be used in evidence against me on my trial for the offense concerning which this statement is made, say:

"Well, I might as well tell the truth about the matter. It's come to the point where I might as well tell the truth. I make this statement voluntarily, yes, sir. I already told some lies about it, but I have got to the place where I might as well tell the truth, the whole truth, yes, sir.

"Well, I got here on Saturday between 7 and 8 o'clock; and went to the Reservation; to Belle Williams' place. I had a pair of overalls wrapped around a pistol which I carried with me. When I got to Belle's I asked her to keep the pistol for me until I got ready to go. She taken the pistol and gave it to Doll Baby.

"After leaving Belle's house, comes on down to corner of Bowie and Park Street, and when I gets there meets Chas. Nelson and Slippers (No, sir, I don't know his other name). He was called Slippers, that's all I know.

"Well, when I gets thereon the corner I meets them. They says to me, 'Hello, Sonny Boy.' I says, 'Hello.'

"We talks there a while. Chas. asked me how everything is in New Orleans. Wanted to know if I had heard anything about him down there. That he shot a nigger and had to leave there. I told him I hadn't heard anything about it. Didn't know anything about it.

"Then they asks me if I wanted to get in on something around here? Asked me if I thought I could get a hold of some—something. I told them I didn't know. I might get hold of something. Then Chas. Nelson told me they had a place somewhere around the Opera House they was going to throw a guy.

"Says he, 'Do you want to go with us?' I said, yes, I would go with them. Then we talked about it. When he said they was going to throw a guy, I told them I would go with them, but didn't want to go and hurt anybody, that I could always get mine without hurting

anybody; that I never hurt anybody; that I didn't want to bother anyone.

"Chas. said there would be nothing to it, so we talked there awhile, and I started to go on off. Before we finished talking, Lonny Secret came up, and we had to break up our conversation.

"Before Lonny came up, and when I was getting ready to go off, they told me that the place they was going through was in the Opera House building. Charlie said to me, 'Well, kiddo, you going with us, ain't you? You will be there?' I said, 'All right, yes, I will be there.'

"He said, 'Well, you meet us close to the Opera House about eleven or twelve o'clock, between those hours,' and I told him 'All right.'

"I left him and went to Rolan and Foley's place; their barroom, and played some pool, about four games, but kept on losing, so I quit. About that time, two officers came in and looked round the place, and asked the niggers where they was working.

"I came out from the barroom between Babe Hamilton's place and the barbecue stand; meets Charlie and Slippers again.

"They says to me, 'Well, kiddo, you're going, ain't you.' I says, 'Why sure, I'm going.' They said, 'Be sure and be there; don't fail us.' I said I would be there all right. Well, we completed our plans in that way, so I left them and went back to the corner. Yes, I told them before I left that I would be with them when they went.

"Well, went down to the corner of Orleans and Bowie; down Orleans to Crockett; goes back to the reservation; comes back from there; comes to Crockett and down Crockett to a fruit stand then went back to the reservation, then to Belle William's place, went in cross the gallery to the room where she told me I could sleep; lays down on the bed, and went to sleep; slept there till about eleven o'clock, between 'leven and twelve at night. Gets up and goes out across gallery, on the side where the room was, goes up and across by the freight shed and the depot, goes on down that street that runs by the Opera House, and meets them (Charlie Nelson and Slippers, yes, sir). Meets them there by the corner of the street where the Opera House is on. Yes, sir, meets Charlie Nelson and Slippers at the corner where that grocery store is.

"They says, 'Well, old kiddo, you got here.' I says, 'I just woke up in time. Thought of what you told me. Got up right away and come on here.'

"We went across the street. They said we was going up in the Opera House. That was where we were going to get a hold of something. I said all right, so we started in. Charlie Nelson was in the lead; goes through kinder open place, the entrance to the building; and through the place where the swinging doors are, into the lobby or some kind of place inside the swinging doors. We walks on a little piece till we comes to some steps on the right. Goes up some steps to the fourth floor, I think it was, the floor where the man was killed, where he fell down and lay.

"As we are going up, the elevator comes down. I could hear it coming down. It made a noise, so we got over kinder in the corner of the stairs, and didn't make any fuss. We didn't know whether it was coming back. Well, the elevator didn't come back. Stayed there about ten or fifteen minutes, without making any fuss, to see if the elevator was coming back, but it didn't come; so Slippers goes into a little room to the left of the elevator and to the right of the steps and gets a piece of pipe; the door to the little room was open, I think; anyway he gets there and gets the pipe and comes back out; and Charlie places himself in front of the elevator door after Slippers came back with the pipe. Slipper gave Charlie the pipe and Charlie gave Slippers his pistol, it was a 38-special.

"As I says, Charlie stands in front of the elevator door, and Slippers stood on the other side of the elevator door, just behind Charlie; and I stood off kinder from the elevator, stood in a sort of little hallway in front of the steps as you come up the steps. And after that, we heard someone coming down the steps and Charlie says, 'That's the man. That's him. That's the guy we are going to throw.' Chas. says that. Slippers says, 'Yes, that's him.'

"When the man came down the steps, I couldn't see what he had under his arm. He had some kind of a bundle under his arm, something white, but I couldn't tell what it was.

"When he put his foot on the floor next to the bottom step, Charlie struck him with the pipe; and when he struck him, he fell; and when he fell Charlie struck him again with the pipe; and after that Slippers lit on him and commenced to batting him with a pistol, a 38-special, 6-inch barrel. How many times he hit him I don't know, don't remember; never paid much attention but know that he struck him several times with the pistol. After that, they laid the pipe down and went through him, searching him and got a pocketbook out of his pockets; they went all through him, found what they could.

"The pocketbook I don't know what color it was, it was kinder reddish, and folded up, had a place where you could put money. After Charlie knocked him down and Slippers beat him with the pistol, Charlie went up the steps a little piece and turned on the light. Then they went through the man. Rolled him over and went through him. I didn't have anything to do with them at the time. I just came up and looked on. I didn't do anything right then.

"After they went through him they takes the white something, I can't say what it was, but he had it under his arms; they takes it and wipes off their hands first; and after they wipes off their hands, they wipes off the pipe with the white thing, and lays it down, I don't know where. Never paid much attention where they lays it down, but after that Charlie Nelson started up the steps. About that time I was fixing to take the watch on the man. Charlie started up the steps, and I told him, when he says something about going up, I told him, 'No.

It ain't no time for us to go up there, because someone is liable to come up and catch us.' I told him I didn't feel so good about the matter anyway, and that we had better go down from there.

"So I takes the watch; and while I takes the watch, I saw something laying on the floor on the side of the body near to the steps. It was laying in some blood. Some kind of glass shining in the blood; and after we all got together, and after talking, agrees we had better come down. After that, Charlie goes up the steps a piece and turns off the light which he had turned on before; after he turns off the light, we comes on down and goes on back down the steps. All three comes down the steps.

"As we started off down the steps, I heard a noise like someone struggling to get up; didn't know what the noise was, sounded like someone trying to get up, and making a fuss or a struggle.

"We comes on down and goes over across the street by the grocery corner, and stood there awhile and talked over the matter. Then we goes on down to the next corner where the little street runs from the depot. On that corner there was some little sycamore trees on the bank. We stood there on the corner and talked awhile.

"I said to them, 'Well, are you going to give me any of that money? Ain't you going to give me some of it?'

"They said to me, 'God damn, you don't get none of it. You don't get none of it; you stood there and didn't do nothing at all. You don't get nothing.' That's what he says. So we comes on down to the next corner, at the other end of the depot on that same street. Comes out there to that street that comes in front of that big hotel (The Crosby, yes, sir). Comes to barroom that corner, and stood there.

"Then I tells them that if they ain't going to give me any of the money, I am going to get me some.

"They says that they are going somewhere and wash their hands. Slippers says, 'I am going somewhere and wash my hands;' and Charlie says 'I am going to wash mine, too.' Then Charlie says, 'When I wash my hands, I'm going to Houston; are you going.' Slippers says, 'Yes, I'm going.'

"Then they goes down the street toward the packing house; and I makes out like I was going back to the reservation; like I was going to Belle's; and after they gets down the street around the corner where they can't see me, I goes back and comes up the street to the little alley way that goes back to the Broadway Hotel.

"Since that time I have seen both of them once or twice, I think. Both Charlie and Slippers. I never knew how much they got off Mr. Lynch. Slippers got the pistol he had from Charlie, it belonged to Charlie. Charlie gave it to him when we was going up the steps; when Charlie hit Mr. Lynch with the pipe he never did nothing but groan as he fell. Never said anything; just groaned. When he fell I never paid any attention where his hat fell. It was about 11:30 or 12 o'clock when he was hit. I never saw him before. Slippers said

he knew about Mr. Lynch having money. I don't know how he knew; think he worked in the Opera House some time or other; anyway, Slippers had found out before we started out. Slippers had worked there in the Opera House; and knew Mr. Lynch had money.

"When Mr. Lynch was struck he had on a coat; there was a bundle under his arms.

"There wasn't any blood on my hands, no, sir. I didn't have to wash my hands, because they didn't have any blood on them. Never got any blood on them nor on my clothes, when I took the watch out of the man's pocket. Slippers and Charlie both of them got blood on their hands and on their clothes too.

"I do not remember the date that this occurred, never paid any attention; don't remember; I know it was in Beaumont, in Beaumont, Texas, just that.

"When Charlie struck Lynch he fell kinder toward the wall on his face. Charlie turned him over. Slippers standing up there close by, and I was standing a little bit away. I hadn't got any closer to him. When I took the watch Slippers was standing off just a little piece, with his hands kinder shoved in his pockets:

"I don't know how many times he was hit. I think that he (Mr. Lynch) was struck twice by the pipe and he might have been struck oftener. I didn't pay so very much attention; but know that Charlie struck him twice with the pipe. There was some blood there where Mr. Lynch fell. When the light was turned on, I saw there wasn't so very much, but a small puddle of blood there on the floor. I never got into the blood or got any of it on my clothes or hands. I was kinder careful; didn't want to get into any of it.

"Charlie and Slippers never told me how they knew Mr. Lynch had money or anything about it. They just asked me if I wanted to go with them on a little job. It was all made up when I got here. They rung me into it so they could have me mixed up in it.

"Slippers was a smart little nigger that time. They says they wasn't going to hurt anybody, but said something about they was going to throw a guy. When they got up there on the landing, they said they was fixed up to clean him, to kill him, yes, sir.

"Mr. Lynch didn't have any time to make any resistance. Charlie stood in front of the elevator and struck him with the pipe just as he came down to the bottom of the steps. He never had any chance to do anything."

In addition to the confession, the State introduced evidence showing that appellant was in Beaumont the night of the homicide, stopping at the house of Belle Williams. This witness testified appellant had no money on Saturday (the homicide occurring Saturday night) but that he came back to her house between 3 and 4 o'clock Sunday morning, when he had a roll of bills, and that he had blood on himself and the bills. The State proved that deceased, who was the steward of the Elks Club, was alive at eleven o'clock Saturday night, and was killed

on the steps leading from the Elks Club to the street, and that he was killed by striking him on the head with a blunt instrument. An iron pipe with blood on it was found near deceased. He was found on the steps, or landing about 6 o'clock next morning. Policeman Bailey testifies he saw appellant with two other negroes at the elevator leading up to the Elks Club about 11 o'clock on the night of the homicide. The State introduced witnesses to prove that deceased on Friday before the homicide on Saturday night had carried his watch to a jeweler to be repaired where the number on the watch and other identifying marks were made of record. That on Saturday evening the porter at the club called for the watch, and the porter testified he delivered the watch to deceased about 6 o'clock on the evening of the homicide. A witness testified he bought this watch from appellant a few days after the homicide, and positively identifies appellant as the man from whom he bought the watch and the jewelers positively identify the watch as the one belonging to deceased, and which, by the State's testimony, is shown to have been returned to deceased the evening before the homicide occurred that night. In this connection Mr. Fletcher, Mayor of Beaumont, testifies, without objection, as follows: "As to what defendant said about the watch, he said it was an open face watch. I hadn't shown it to him when he said that. He said it was an open face and had flowers on the back of it. Then I turned it to him and he handed it back to me and said that is the watch, and when he handed it back to me he said, 'It has a screw back,' so I unscrewed it —and he had told me before that there was writing in it, and I looked and didn't see any writing only what you see in here—and I asked him 'is that what you call writing,' and he said, 'No, look down in that edge,' and I looked down in the edge as carefully as I could, and you have got to have the light in a certain way or you can't see anything, and I couldn't see anything from where I was sitting as he was between me and the window—and he said, 'Get next to the window,' and I did, and I saw some figuring—it wasn't writing—it was figures in two different places, and I asked him if that is what he had reference to, and he said, yes." This is the watch shown to have belonged to deceased, and which was taken the night of the homicide, and which a witness testifies he bought from appellant shortly after the killing. The killing occurred sometime between 11 o'clock Saturday night and 6 o'clock Sunday morning and outside of the confession of defendant, was a case of circumstantial evidence. While we have not recited all of the circumstances in the case, yet we think we have stated the evidence sufficiently to make the holding of the court on the matters hereinafter discussed understood.

1. In bill of exceptions No. 1 appellant complains that the court erred in overruling his verbal application for a change of venue, and in bill of exceptions No. 2 he complains of the court overruling his written application for a change of venue. The application was not supported by the affidavit of two credible persons, in fact, was sworn

to by defendant alone. Article 615 of the Code of Criminal Procedure provides that an application must be supported by at least two credible persons and it has been held that the provisions of this statute must be complied with to entitle a defendant to a change of venue. (Mitchell v. The State, 43 Texas, 512; O'Neal v. The State, 14 Texas Crim. App., 582; Macklin v. The State, 53 Texas Crim. Rep., 197.)

In bill No. 3 appellant complains that Dr. B. F. Calhoun, the physician who examined deceased the morning he was found dead on the stairway, was permitted to testify as to his opinion as to the character of instrument that was used in inflicting the wounds. Dr. Calhoun was a physician of long standing, examined the wounds, and this bill presents no error.

Objection was made to the witness Smith being permitted to testify that after the arrest of appellant he escaped from prison. It is always permissible to show flight, especially in a case depending on circumstantial evidence, in part.

In the next bill appellant complains of the action of the court in permitting the confession to be introduced in evidence, alleging that the confession was made when appellant was intimidated, and was sick and suffering from fear and excitement; that defendant was under arrest at the time the confession was made, and it was taken in shorthand and afterwards reduced to writing; was not a voluntary confession, and he had not been given the warning the law requires. That he was coerced and coaxed into making the confession, and was under the influence of intoxicants at the time. Appellant's testimony would support some of the objections so made, but the testimony of the county attorney, the sheriff, Mayor Fletcher, and the two subscribing witnesses would show that the confession was freely and voluntarily made, and that none of the objections made were tenable. The court retired the jury and heard evidence, and decided that the evidence was such as to render the confession admissible, but states that the defendant and the State could introduce evidence on this issue before the jury, and he would submit the question for their determination. We think the evidence of the State was such as to make the confession prima facie admissible, and the court did not err in admitting it. In his charge on this question he instructed the jury:

"Upon the subject of confessions I charge you as follows: The confession shall not be used if at the time it was made the defendant was in jail or other place of confinement, nor while he is in the custody of an officer, unless made in the voluntary statement of the accused taken before an examining court in accordance with law, or be made in writing and signed by him, which written statement shall show that he has been warned by the person to whom the same is made: First, that he does not have to make any statement at all. Second, that any statement may be used in evidence against him on his trial for the offense concerning which the confession is therein made, or unless in connection with said confession, he makes statements of facts or circumstances

that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed; provided, that where the defendant is unable to write his name and sign the statement by making his mark, such statement shall not be admitted in evidence, unless it be witnessed by some person other than a peace officer, who shall sign the same as a witness.

"Now, I charge you that before you can receive the statement claimed by the State to be a confession of the defendant as evidence you must believe beyond a reasonable doubt that the requirements named above were all complied with and if you do not so believe you will disregard the same and proceed to consider the case from the standpoint of circumstantial evidence; and further in regard to confessions you must look to all the facts and circumstances in evidence prior to leading up to and at the time the confession is said to have been made to determine if it meets the requirements of the law set forth in this charge."

This charge is not subject to the criticism contained in bill of exceptions No. 14, and there was no error in the court refusing to give the special charge No. 2 asked by defendant, instructing the jury not to consider the confession, and the court did not err in refusing to give special charge No. 1 because it was not applicable to the evidence. The confession was not taken at the time and place named in this charge, but at a different time and place, and if the testimony of witnesses are to be believed, he had stated the same matters before being taken to the place named. The charge given sufficiently submits the issues involved, in the absence of a request for more specific application of the law, and especially as the motion for a new trial points out no error in the charge given. Besides the facts and circumstances in evidence were sufficient to support the verdict had the confession not been introduced in evidence, and the court properly instructed the jury on a case of circumstantial evidence.

The defendant desired to ask the witness Kiber and Hobby in regard to the loss of an account book belonging to deceased which had never been found. The fact that an account book had been lost and had not been found would not tend to prove any issue in the case. Had defendant stated he expected to prove that this account book had been found in the possession of a person other than defendant, it might have been admissible, but evidence merely going to show that at the time deceased was killed an account book had been lost and never recovered would not tend to prove any fact connected with the defense of defendant.

Exceptions were also reserved by defendant to the action of the court in refusing to permit him to prove by the witnesses Polk, Kelly and others what they had heard about deceased having trouble with one Fred Guess. These witnesses were permitted to tell what they knew about the matter, and what they had heard deceased say, and all facts within their knowledge, but not what they had heard others say. That

would have been hearsay, and was not admissible in evidence. Neither did the court err in refusing to permit witness Landry to testify from his experience as an officer what would be the probable effect on a negro or person of the lower classes, of certain persons threatening, coaxing, intimidating, or cursing him, and whether such conduct would be likely to induce or impel him to make a confession. The facts were before the jury for them to draw deductions and Mr. Landry was not shown to have any expert knowledge not possessed by the ordinary juryman.

The State asked defendant, while on the stand: "What did you come back to Beaumont for, when you were arrested?" to which the defendant objected. The answer of the witness to this question, if any was made, is not shown by the bill, and it is therefore impossible for us to determine whether or not he could have suffered any injury, and the bill is therefore not such that this court will review. Were the bill such as we could consider—the coming and going of a defendant, and his conduct in general, after the commission of an offense is in general admissible in evidence unless the State should thereby seek to prove another and different offense.

Several exceptions were reserved to the remarks of counsel for the State. No instructions were requested instructing the jury not to consider such remarks, and in the absence of instructions being requested this bill will not present such error as the court will consider unless the remarks of counsel were wholly uncalled for, and of such character as to arouse the passions and prejudice of the jury. The remarks in this case were not of such character, and were in fact, deductions from the evidence in the case.

These are all the bills of exceptions in the record, but in the motion for a new trial appellant complains of the action of the court in failing to give special charge No. 3, in that the evidence under a given theory would make the defendant only an accomplice, and he could not be convicted as an accomplice under this indictment. Said charge correctly stated the law that defendant could not be convicted as an accomplice under this indictment, but the evidence does not raise the issue of him being an accomplice. If the confession of defendant is true in every detail, it might be a question of whether he would be guilty of murder in the first degree, but this question is not raised by bill of exceptions, or motion for new trial, but neither his confession nor any other evidence in the record would make him an accomplice.

Attached to the motion for a new trial are some affidavits taken by an attorney for defendant in this case. This question was fully discussed in the case of Maples v. State, 60 Texas Crim. Rep., 169, and it was held that affidavits taken by an attorney in the case will not be considered by this court. But if we were to consider them, they do not disclose such a state of affairs as would disqualify the juryman Daniels.

A number of matters presented in the motion for a new trial in regard to the evidence are not supported by any bill of exceptions in

the record. Consequently we can not consider them. The ground in the motion alleging newly discovered evidence can not be reviewed because it is not supported by evidence or any affidavit attached to motion for new trial.

The allegation in regard to the juryman Glenn can not be considered, as it is not supported by evidence, nor an affidavit of any person. Neither can we consider the ground stating that the court reprimanded counsel for appellant. If such proceedings took place, there is no bill in the record verifying that fact, and a mere allegation in the motion is not sufficient to bring this matter before us for review.

We have carefully considered all questions raised by bills of exceptions in the record, or properly raised by grounds stated in the motion for a new trial, and we are of the opinion that no error is presented which would authorize a reversal of this case, and the judgment is affirmed.

*Affirmed.*

[Rehearing denied March 6, 1912.—Reporter.]